UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| AT&T CORP., <br>       Plaintiff, <br><br> v. <br><br> ROBERT G. STOCKARD and <br> RICHARD E. CLARK, <br>       Defendants. | Civil Action No. 1:03-cv-11377 RCL |

**PLAINTIFF'S SUR-REPLY TO DEFENDANTS' REPLY IN FURTHER SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

The Plaintiff, AT&T Corp. ("AT&T"), offers this Court this sur-reply brief (the "Sur-Reply") in response to the Defendants' Reply in Further Support of Their Motion for Summary Judgment ("Reply").[1]

## I. Introduction

The Defendants' Reply offers nothing more than a pointless rehashing of their initial argument, attempting to distort and twist facts in their favor but failing to address affidavit and deposition testimony fatal to both their motion and overall defense. Contrary to established principles regarding summary judgment adjudication, the Defendants ask this Court to draw all inferences in their favor, even though the factual record before this Court undercuts their defenses, and at the very least demonstrates that there are material issues to be tried.

---

[1] This Sur-Reply is filed pursuant to leave granted by Magistrate Collins in his Order dated May 26, 2005. AT&T continues to rely upon the following filings submitted to this Court on or about January, 18, 2005, in support of the Sur-Reply: AT&T Corp.'s Opposition to the Defendants' Motion for Summary Judgment and Request for Oral Argument; AT&T's Response to Defendants' Corrected Local Rule 56.1 Statement of Material Undisputed Facts and Legal Elements ("AT&T's L.R. 56.1 Response"); Plaintiff's Memorandum of Law in Support of its Opposition to the Defendants' Motion for Summary Judgment ("Memorandum"); Affidavit of Rhonda J. Paradis; Affidavit of Joseph A. Ronan III; Affidavit of Christopher Ginnane; Affidavit of Carlos Polit; and Affidavit of Thomas T. Reith, Esq. (collectively "Opposition Papers").

As set forth more fully herein, the Defendants' Reply utterly fails to meaningfully respond to AT&T's Statement of Additional Material Facts and to the Affidavits of Christopher Ginnane and Carlos Polit, two former senior employees of Salience whose testimony fully corroborates the claims of AT&T and thereby precludes the granting of summary judgment.

## II.     Argument

### A.     The Defendants Would Have This Court Misapply The Summary Judgment Standard And Discount AT&T's Material Factual Disputes

As this Court well knows, one of the established principles of summary judgment entitles AT&T, as non-moving party, to all favorable inferences.  See Oliver v. Digital Equipment Corp., 846 F.2d 103, 105 (1st Cir. 1988).  Notwithstanding this fundamental principle of the standard, the Defendants ask this Court to discredit all material issues raised by AT&T and to draw all inferences in favor of the Defendants.  Such is not the standard, and accordingly the Motion must be denied.

### (i.)     The Court must infer in favor of AT&T that AT&T did not possess equal, let alone superior knowledge of any facts that would bar their recovery for the Defendants' fraud

The Defendants' had superior knowledge concerning Salience's ability to sell those lines necessary to justify the Pre-bills and of Salience's relevant business processes -- namely, 1) superior knowledge as to Salience's headcount numbers and productivity, 2) superior knowledge of Salience's high turnover rates and Salience's inability and the Defendants' unwillingess to compensate for same, 3) superior knowledge as to Salience's personnel morale issues, and 4) superior knowledge of Salience's financial wherewithal or lack thereof.  See e.g. SOAFs, ¶¶115-132.[2]  The Defendants have not effectively disavowed themselves of this superior knowledge.[3]

---

[2] "SOAFs" refers to AT&T's "Statement of Additional Material Facts" found at pages 71-86 of AT&T's L.R. 56.1 Response.

[3] See discussion infra at § II(C) addressing the Defendants' failure to rebut AT&T's claims as to their knowledge.

AT&T was not aware of the extent of the headcount issues -- such as turnover rates and actual employees -- as information germane to Salience's headcount was either withheld from AT&T or otherwise only available to AT&T on a sporadic and unverifiable basis[4] (see e.g. CSOFs, ¶¶28, 33, 36, 70-71, 73, 75, 77, 79-80; SOAFs, ¶¶138-143).[5]  AT&T was not aware of the extent of the financial issues Salience suffered from, because, it was either withheld from AT&T or, when AT&T inquired as to the severity of same, the Defendants represented that the issues would have no effect upon the Metro Engagement (see e.g. CSOFs, ¶¶81[6]-83; SOAFs, ¶¶144-146).  AT&T's assembly of certain analyses for budgetary purposes from figures generated in the first instance by Salience did not in any way present AT&T with a full picture of material happenings at Salience. AT&T relied upon the Defendants' and their agents' representations, and paid the Pre-bills because the Defendants submitted them and AT&T expected and understood that they were good-faith, factually-based accurate estimates of how many lines Salience would sell.  See e.g. CSOFs, ¶¶12, 60; SOAFs, ¶¶155-157.[7]  Any concern that AT&T may have had about Salience being able to make enough sales should have been obviated - - and would have been but for the Defendants' fraud - - by (i) the fact that the Salience was required to pay back the money AT&T overpaid pursuant to what it believed at the time it

---

[4] Interestingly, the Defendants take issue with an April 2003 report that AT&T prepared, before this suit was filed, by one of its employees.  The Defendants claim that the report demonstrates AT&T's knowledge of headcount issues.  The Defendants know full well that the report is nothing more than a backward looking "guesstimation". See e.g. AT&T's Counterstatement to the Defendants' statement of purported undisputed facts ("CSOFs"), ¶33, which CSOFs can be found at pages 1-71 of AT&T's L.R. 56.1 Response.  Moreover, even if one were to assume that AT&T gained any knowledge by this report, AT&T "gained" it after the monies at issue had been paid over. See e.g. CSOFs, ¶33.  On a related note, the Defendants ask the Court take notice that they set internal headcount goals.   See Reply, p. 1.  The goals don't mean much, when in actuality the Defendants never reached those goals as a result of their willful failure to take action to ensure high headcount number and quality.  See e.g. SOAFs, ¶¶119-123.
[5] The Defendants continued reliance upon information in AT&T's possession that bore only on certain time periods, time periods which are irrelevant to the present cause of action, is simply unjustified.  See Reply, Ex. A, p. 12.
[6] Please note, the record reference in CSOFs, ¶81 should read "194:10-195:11" not "194:20-51".
[7] Unashamed, the Defendants argue that the fact the Pre-bill had a "cap" and that the Defendants billed up to it is irrelevant and inconsequential.  See Reply, p. 3, fn. 5; Reply, Ex. A, p. 7.  Although the Defendants have admitted in their deposition testimony that Pre-bills were supposed to be accurate estimates submitted in good faith (see e.g., SOAFs, ¶¶109-110), they caused Salience to bill up to the cap with the knowledge that there was no way Salience could achieve the necessary sales.  See e.g. CSOFs, ¶¶18(a), 90; SOAFs, ¶¶113-117, 119-121, 123, 135, 147.

3

received the Pre-bill was a good-faith estimate of those lines that Salience could sell, and (ii) those representations the Defendants and their agents made concerning Salience's ability to administer the Metro Engagement (see e.g. CSOFs, ¶¶14, 80-83, 95; SOAFs, ¶160).

As the record plainly indicates, AT&T was at a distinct disadvantage to the Defendants when it came to information concerning Salience's administration of the Metro Engagement and its home office issues. The disadvantage was able to be exploited by the Defendants without AT&T's knowledge due to the lengthy lag time between the Pre-bill payment, the initial point of sale and the true-up/true-down process. See e.g. CSOFs, ¶¶12, 21, 50, 68, 90. In the end, by the time AT&T became aware of the issues that detrimentally affected Salience's ability to administer the Metro Engagement, and took the steps necessary to remedy the situation, AT&T had already paid out the money at issue here. See e.g. CSOFs, ¶33.

**(ii.)   The Court must infer in favor of AT&T that the Defendants' made material representations to AT&T and that AT&T suffered <u>damages in reliance upon those representations</u>**

The record is clear, instead of informing AT&T about those issues that negatively affected Salience's ability to meet the Pre-bill quotas, Defendant Clark, and agents[8] of the Defendants, misrepresented to AT&T that the Metro Engagement was progressing, moving in the right direction. See e.g. SOAFs, ¶¶138-146, 154, 158, 160. Specifically, among other things, they misrepresented: that headcount numbers were on the rise or that they would ensure same; that Salience was financially sound and that Salience's purported new business would ensure that Salience would remain so; and that Salience would pay back Pre-bill overages to AT&T. See id. Unfortunately, without knowledge to contradict the representations made,

---

[8] "Agents" refers to the Defendants employees who participated on weekly conference calls with AT&T, wherein AT&T sought, but was not given -- at least not until AT&T had paid out most monies in dispute, certain information relevant to the administration of the Metro Engagement and Salience's ability to administer same (see e.g. CSOFs, ¶¶28, 73, 77), as well as Christopher Ginnane, Salience's former General Manager, and Carlos Polit, Salience's former Director of Sales Operations for the Metro Engagement (see e.g. SOAFs, ¶¶102, 104; see also discussion infra at §II(C) concerning Messrs. Ginnane and Polit).

AT&T relied upon the Defendants', as well as their agents' representations, and the perceived truthfulness of same, and AT&T continued to pay the perceived accurate Pre-bills when they were issued. See id. As a result of its reliance [on the Defendants'] (*sic*) fraudulent issuance of the Pre-bills, and the other aforementioned misrepresentations, AT&T suffered damages of $3,244,101. See e.g. SOAFs, ¶¶158-161.

### (iii.) The Court must infer in favor of AT&T that the Defendants controlled the success or failure of the Metro Engagement, not AT&T

Incredibly, despite ample record to the contrary, the Defendants continue to claim that they could not control those conditions affecting the sales, which were necessary to justify the Pre-bill numbers. See Reply Brief, pp. 5-6; Reply, Ex. A, ¶¶32(a) and 32(b). First, the factors that allegedly affected Salience's sales and were allegedly within AT&T's control did not affect Salience's sales to the extent claimed -- or at all. See e.g. CSOFs, ¶¶32(a)-32(b). More importantly, the ultimate success or failure of Salience to reach the sales necessary to justify the Pre-bill laid with the Defendants and their agents. See e.g. CSOFs, ¶32(a).[9] The Defendants' former employees, Christopher Ginnane and Carlos Polit confirmed as much via their undisputed affidavit testimony. See e.g. SOAFs, ¶¶106-107, 112-113, 121-124, 135, 147.[10]

With all reasonable inferences drawn in AT&T's favor as to the above facts, as well as those others cited in AT&T's Opposition Papers, AT&T is clearly entitled to recover on its claim for fraud based upon the Pre-bills, which were estimates, promissory in nature.[11] See e.g. SOAFs, ¶¶109-111; see also Rodowicz v. Massachusetts Mutual Life Insurance Company, 192

---

[9] The Defendants argue that the issue as to who controlled the success of the Metro Engagement is an issue of law, yet they fail to cite any legal authority in support of this proposition. See Reply, Ex. A, pp. 14-15. The issue is clearly factual -- was it up to the Defendants to control their employees and the administration of the Metro Engagement or was it up to AT&T?

[10] Again, if the alleged "factors" impacted Salience's sales as the Defendants now argue, the Defendants should have adjusted -- as AT&T expected and understood they would -- the Pre-bills to reflect a lower and accurate sales figure, instead of consistently billing for the utmost Pre-bill allowed. See e.g. CSOFs, ¶12.

[11] AT&T refers this Court to pp. 6-10 of its Memorandum for a complete discussion as to AT&T's entitlement to recover on the "estimates".

F.3d 162, 175-76 (1st Cir. 1999); Lawson v. Affirmative Equities Company, L.P., 341 F. Supp.2d 51, 65 (D. Mass. 2004); Armstrong v. Rohm and Haas Company, Inc., 2004 U.S. Dist. LEXIS 25129 **24 (D. Mass. 2004); Bolen v. Paragon Plastics, Inc., 754 F. Supp. 221, 226 (D. Mass. 1990); see also Barrett Associates, Inc. v. Aronson, 346 Mass. 150, 152, 190 N.E.2d 867, 868 (1963) "present intention as to a future act is a fact … susceptible of proof. When such intention does not exist … it is a misrepresentation of a material fact … [and] may be the foundation of an action for deceit") (quoting Feldman v. Witmark, 254 Mass. 480, 481-82, 150 N.E. 329 (1926)); see also Zimmerman v. Kent, 31 Mass.App.Ct. 72, 79-80, 575 N.E.2d 70, 75-76 (1991) (holding that there are exceptions to the general rule precluding recovery based upon forecasts when the knowledge levels between the parties are unequal) (citing Gopen v. American Supply Co., 10 Mass.App.Ct. 342, 345, 497 N.E.2d 1255 (1980)); Lawson at 65; Briggs v. Carol Cars, Inc., 407 Mass. 391, 396, 553 N.E.2d 930 (1990); Pietrazak v. McDermott, 341 Mass. 107, 110, 167 N.E.2d 166 (1960); Stolzoff v. Waste Systems International, Inc., 58 Mass.App.Ct. 747, 760, 792 N.E.2d 1031, 1041 (2003); McEneaney v. Chestnut Hill Realty Corporation, 38 Mass.App.Ct. 573, 575, 650 N.E.2d 93, 96 (1995); Learning Express, Inc. v. Ray-Matt Enterprises, Inc., 74 F. Supp.2d 79, 85 (D. Mass. 1999) (internal citations omitted).[12]  At the very least, there are genuine issues of material fact, precluding entry of summary judgment.

### B. The Defendants Improperly Impute Actual Intent As An Element To AT&T's Trial Standard Of Proof At The Summary Judgment Stage.

The Defendants attempt to undermine AT&T's fraud claim by imputing a duty upon AT&T to establish the Defendants' intent to defraud AT&T; they are wrong to do so. See Reply,

---

[12] AT&T previously cited to Liberty Mutual Insurance Company v. M.C.K., Inc., No. 02-P-173, table op. at 1-3 (Mass.App.Ct. Sept. 27, 2004) for informational purposes because the factual similarities to the present matter were so striking.  See Horner v. Boston Edison Co., 45 Mass.App.Ct. 139, 141, 695 N.E.2d 1093, 1094 (1998).  The Defendants strenuously objected to AT&T's citation of Liberty. The Defendants did so because of the dispositive effect it would have upon their Motion, which is improperly premised in part on the idea that one cannot recover for fraud on "estimates".  AT&T will not be harmed if the Court elects not to consider the information offered by Liberty, for it has cited ample alternative authority.

p. 5; Reply Ex. A, pp. 41. More specifically, the Defendants' interpretation of the legal requirements for fraud secondary to promissory statements or opinions is simply incorrect. The Defendants contend that the "mere fact that predicted performance is not realized is insufficient to demonstrate that a defendant falsely stated intentions." See Reply, p. 5. This requirement of proving the fraudulent intent is neither what the case law teaches nor is it what AT&T contends.

The actual standard, as stated in Pietrazak v. McDermott, is if "a statement of fact which is susceptible of actual knowledge is made as of one's own knowledge and is false, it may be the basis for an action of deceit without proof of actual intent to deceive." (emphasis added). See Pietrazak at 110. The Massachusetts Court of Appeals summarized the standard thusly in Stolzoff v. Waste Systems International, Inc.:

> a statement of opinion may be actionable where the speaker possesses superior knowledge concerning the subject matter to which the misrepresentations relate, Gopen v. American Supply Co., 10 Mass. App. Ct. 342, 345, 407 N.E.2d 1255 (1980), or where the opinion is 'reasonably interpreted by the recipient to imply that the speaker knows facts that justify the opinion.' Briggs v. Carol Cars, Inc., 407 Mass. 391, 396, 553 N.E.2d 930 (1990).

58 Mass. App. Ct. 747, 760, 792 N.E.2d 1031 (2003). The record is replete with evidence that the Defendants had superior and actual knowledge about their ability to meet the targets represented in the Pre-bills. See e.g. SOAFs, ¶¶115-135, 147. Further yet, the record demonstrates that when given the opportunity, the Defendants offered misrepresentative information to substantiate the Pre-bills they submitted. See e.g. CSOFs, ¶¶80-83; SOAFs, ¶¶133-135, 142.

Should this Court be inclined to consider the Defendants' actual intent at summary judgment, which AT&T respectfully suggests is unwarranted, the Court will see that the Defendants' fail to offer record support that they intended to do what was necessary to reach the sales that would justify the Pre-bills, while AT&T has presented ample and dispositive evidence

demonstrating that the Defendants could not possibly have -- in light of their superior knowledge of Salience's inability to make such sales -- intended to reach their represented targets. [13] See e.g. SOAFs, ¶¶115-135, 147.

     A review of the record shows that the Defendants could not have intended anything other than to use the inflated Pre-bills to defraud AT&T. By way of but one example, Salience's own internal budget, which was prepared by the Defendants called for sales far less than the levels being Pre-billed to AT&T. See SOAFs, ¶133. The Defendants attempt to deflect attention from these budgets, by now stating that the budgets were "conservative revenue estimates." See Reply, p. 5. That is not what Defendant Stockard testified to in his deposition. To the contrary, Defendant Stockard testified that the budgets were presented by Stockard himself to Salience's Board of Directors as accurate numbers of expected revenues. See e.g. SOAFs, ¶133. This deflection is but one more example of the Defendants' attempts to revise the record.

     Regardless, even if actual intent was the only necessary element of AT&T's proof, which it is not, blackletter principles require that the Defendants' intent be determined at the time of trial by a fact finder. See Flesner v. Technical Communications Corp., 410 Mass. 805, 809, 595 N.E.2d 1107, 1110 (1991) (case where, among other issues, parties disputed that certain misrepresentations were made and disputed the effect of other misrepresentations that were acknowledged as having been made) citing Pederson v. Time, Inc., 404 Mass. 14, 17, 532 N.E.2d 1211 (1989) ("the generally accepted rule is that the 'granting of summary judgment in a case where a party's state of mind…constitutes an essential element of the cause of action is disfavored'") and Croley v. Matson Navigation Co., 434 F.2d 73, 77 (5th Cir. 1970) (explaining

---

[13] The Defendants' attempts to offer record authority purportedly concerning the Defendants ' individual or joint intent (see Reply, p. 5 [no citation, just bald assertion]; Reply, Ex. A., p. 41) do nothing to combat the affidavit testimony of Christopher Ginnane and Carlos Polit, which, as undisputed, establishes that the Defendants knew they could not make the requisite sales or otherwise justify the inflated Pre-bills. See e.g. SOAFs, ¶¶115-135, 147.

that in cases where a party's intent is an essential element of the cause of action, "[m]uch depends on the credibility of the witnesses testifying as to their own state of mind. In these circumstances, the [fact finder] should be given the opportunity to observe the demeanor, during direct and cross-examination, of the witnesses whose state of mind are at issue"); see also Levy v. Bendetson, 6 Mass.App.Ct. 558, 563, 379 N.E.2d 1121 (1978) (a finding of intent is a matter of fact).

C.  **The Defendants Have Failed To Address AT&T's Statement Of Additional Material Facts, Which Taken On Their Own Create Genuine Issues Of Material Fact, Thereby Justifying Denial Of The Motion**

The Defendants' response to AT&T's well-pleaded Statement of Additional Material Facts is, to say the least, lacking. Incredibly, the Defendants do not even touch upon the affidavit testimony of two of their well-informed former senior employees, Christopher Ginnane, Salience's former General Manager of Salience's engagement with AT&T, and Carlos Polit, Salience's Director of Sales Operations for the Metro Engagement, which directly corroborates AT&T's position that the Defendants defrauded AT&T and undercuts the Defendants' entire defense.[14] See e.g. SOAFs, ¶¶102-104. Messrs. Ginnane's and Polit's sworn and undisputed affidavit testimony establishes that:

> The Defendants were personally involved in the Metro Engagement on a daily basis and the formulation and issuance of the Pre-bills (see e.g. SOAFs, ¶¶105-107, 112, 115-116, 118[15]);

> The Defendants understood that there was a vital correlation between headcount and sales, the sales necessary to justify the Pre-bills (see e.g. SOAFs, ¶¶113-114, 135, 147)[16];

---

[14] The only issues the Defendants take with the Ginnane and Polit Affidavits concern language used by the affiants to describe their first-hand dealings with the Defendants in connection with the Metro Engagement. The language, however, is the Defendants', not AT&T's. The issues taken do nothing to undermine the damning testimony offered.

[15] Please note, references to the Ginnane Affidavit in SOAFs, ¶118 are actually references to the Polit Affidavit.

The Defendants knew that there were serious problems with Salience's headcount turnover, headcount recruiting, headcount quality, personnel productivity, employee morale, and financial wherewithal  (see e.g. SOAFs, ¶¶119-120, 124, 130-131);

Despite their knowledge of these serious issues, and the direct impact they had on Salience's ability to make the sales necessary to justify the Pre-bills, the Defendants did not enable their managers to implement headcount recruitment efforts and actually disregarded their manager's action plans to increase headcount.  See e.g. SOAFs, ¶¶121-122.  In fact, Salience's field managers were encouraged to keep headcount numbers at reduced levels (see e.g. SOAFs, ¶123);

Unfortunately for AT&T, the Defendants instructed their agents to withhold information from AT&T related to the above issues, or to embellish Salience's response concerning same when AT&T inquired (see e.g. SOAFs, 140-143, 145);

Worse yet, despite their knowledge of Salience's headcount turnover, headcount recruiting, headcount quality, personnel productivity, employee morale and lack of financial wherewithal,  the Defendants issued AT&T the Pre-bills knowing that Salience could not --and would not -- be able to reach the sales they represented would be made via the Pre-bills (see e.g. SOAFs, ¶¶135, 147); and

Unbeknownst to AT&T, the Defendants consistently sought to exploit the Pre-bill formula so that they could keep Salience's overall business a going concern  (see e.g. SOAFs, ¶¶147-154).

---

[16] Faced with ample record to the contrary (see e.g., CSOFs, ¶33; SOAFs, ¶¶113-114, 135, 147), the Defendants somehow claim that headcount is irrelevant.  See Reply, Ex. A., p. 11.  As the Defendants themselves testified there is a direct correlation between headcount and the ability to make sales - - the sales necessary to justify the Pre-bill (see e.g., SOAFs, ¶¶113-114).  This is just one more example of the Defendants' failed attempt to discredit material facts favoring AT&T.

Further, the Defendants' counterstatements to the SOAFs completely fail to squarely address, let alone refute that:

the Defendants understood that the Pre-bills, which they were personally involved in formulating, were to be submitted in good faith, every month, with field results having been considered in their formulation, and with the understanding that Salience was going to make its represented targets (see SOAFs, ¶¶109-112 and Reply, Ex. A, p. 40; SOAFs, ¶¶155-157 and Reply, Ex. A, p. 45);

the Defendants' had superior knowledge concerning Salience's ability to sell enough lines to justify the Pre-bills and of Salience's business processes -- namely, (i.) superior knowledge as to Salience's headcount numbers and productivity, (ii.) superior knowledge of Salience's high turnover rates and Salience's inability and the Defendants' unwillingess to compensate for same, (iii.) superior knowledge as to Salience's personnel morale issues, and (iv.) superior knowledge of Salience's financial wherewithal or lack thereof (see SOAFs, ¶¶115-132 and Reply, Ex. A, p. 40);

AT&T did not possess the knowledge the Defendants did as to Salience's administration of the Metro Engagement and relied on the Defendants' Pre-bill submittals (see SOAFs, ¶¶138-146 and Reply, Ex. A, p. 43; SOAFs, ¶¶153-154 and Reply, Ex. A, p. 44; SOAFs, ¶¶158, 160 and Reply, Ex. A, p. 45); and

AT&T relied on the Pre-bills and the assurances that Salience could and would make the sales necessary to justify those Pre-bills to its detriment (see SOAFs, ¶¶155-157, 160-161 and Reply, Ex. A, p. 45).[17]

---

[17] Please note, AT&T has not addressed the so-called "partnership" issue here, because AT&T's Opposition Papers on the issue speak for themselves. The message that was clearly lost on the Defendants, was that the mere fact the Defendants believe a "partnership" existed at one time -- albeit what a "layperson" understood to be a partnership -- only renders their actions that much more reprehensible. See SOAFs ¶¶136-137.

Instead, the Defendants again deflect, again misstate the record and its application to the relevant legal authority, and, inexplicably, ignore fatal affidavit testimony.

First, because the Defendants elected to only share limited information about the Metro Engagement and Salience's ability to administer same with AT&T, while they withheld material information, the Defendants did, contrary to the Defendants' arguments, have an obligation to disclose <u>all</u> of the information concerning the financial situation, headcounts, and market performance.  See <u>V.S.H. Realty, Inc. v. Texaco, Inc.</u>, 757 F.2d 411, 414 (1st Cir. 1985) ("There is much case law in Massachusetts supporting the proposition that a party who discloses partial information that may be misleading has a duty to reveal all the material facts he knows to avoid deceiving the other party"); <u>see also</u> e.g. SOAFs, ¶¶138-158, 160.  Such information would have given AT&T reason to question the validity of the Pre-bills.  See e.g. SOAFs, ¶159.  It also would have placed AT&T on notice that Salience's financial situation was such as to make reconciliation under the Pre-bills much more tenuous.  See e.g. SOAFs, ¶¶144-146, 159.  The Defendants' concealment of Salience's financial situation, headcounts, and market performance was fraudulent.  See <u>Kannavos v. Annino</u>, 356 Mass. 42, 48, 247 N.E.2d 708, 711-712 (1969; <u>Eureka Broadband Corp. v. Wentworth Leasing Corp.</u>, 2004 U.S. Dist. LEXIS 2572 *17 (D. Mass. 2004) (citing <u>Golber v. BayBank Valley Trust Co.</u>, 46 Mass.App.Ct. 256, 258, 704 N.E.2d 1191 (1999) (Courts have repeatedly stated that "half-truths giv[e] rise to a duty of full disclosure," and "may be actionable as whole lies").[18]

---

[18] These authorities were relied upon in AT&T's Memorandum.  The Defendants must have missed them for the Defendants claim on more than one occasion in their Reply that AT&T "provides no valid legal basis requiring such disclosure."  <u>See</u> Reply, p. 2; Reply, Ex. A., pp. 40 and 43.

Second, AT&T's reliance on the Pre-bills was reasonable.[19] The courts have routinely and consistently held that reliance is reasonable unless the plaintiff was confronted with representations that were "preposterous or palpably false." Mahaney v. John Hancock Insurance Co., 6 Mass.App.Ct. 919, 920, 38 N.E.2d 140, 142 (quoting Yorke v. Taylor, 332 Mass. 368, 374, 124 N.E.2d 912 (1955)).  Nothing in the summary judgment record suggests that AT&T was confronted with information, either from the Defendants or otherwise, that a given Pre-bill was "preposterous or palpably false." See Mahaney, at 920.  Rather, the record demonstrates that the Defendants, when called upon to do so, gave credence to the amount of a Pre-bill.  See e.g. SOAFs, ¶¶80-83, 142, 146.

The Defendants again attempt to circumvent factual record by relying upon clearly inapplicable law like Trifiro v. New York Life Ins. Co. 845 F.2d 30 (1st Cir. 1988) to sway the Court in their favor.  The facts of the present case are plainly at variance to those in Trifero.  The Trifiro Court found the plaintiff could not assert that he reasonably relied on the defendants' earlier, oral representations given that he later expressly conceded in writing his receipt of conflicting written representations from the defendants.  See Trifero 845 F.2d at 33-34.  Here, AT&T never received any information from the Defendants indicate that it should not rely on representations the Defendants made via the Pre-bills.  See e.g. SOAFs, ¶¶118, 138-142, 144-145, 153-154, 158, 160.  To the contrary, here the Defendants assured AT&T that all steps necessary to meet the targets in the Pre-bills were being taken.  See e.g. SOAFs, ¶¶142, 146.

Likewise, the Defendants' reliance on Cataldo Ambulance Svs., Inc. v. City of Chelsea, 426 Mass. 383,387, 688 N.E. 2d 959, 961-962 (1998), is misplaced given the facts of the present case.  In Cataldo, the plaintiff, bidding on a city's ambulance service contract, offered affidavits

---

[19] Again, as with all the arguments raised herein, AT&T relies upon its initial arguments found in the Memorandum. More specifically to the issue of reasonableness of AT&T's reliance AT&T directs this Court to pp. 10-13 of the Memorandum.

that it had relied on the city's invitation for bids to the exclusion of the statutory requirements governing such bids. Cataldo 426 Mass. at 386. The Court held that the plaintiff could not rely on subsequent affidavits alleging reasonable reliance in the face of credible evidence of the plaintiff's acknowledged understanding of (and failure to conform with) the statutory requirements during the bidding process. Id. In addition, the Court explained that the:

> question of whether a party's reliance on a promise by another is reasonable is often a question of fact, but in an appropriate case can present an issue of law. This is especially so when the parties involved are of relatively equal knowledge and sophistication.

Id. at 387. The fact that the present Defendants possessed all the information about whether Salience would be able to prospectively meet the target amount in a given Pre-bill does not permit the conclusion that the parties possessed "relatively equal knowledge". Id. Indeed, in light of the Affidavits of Christopher Ginnane and Carlos Polit -- which undisputedly establish that AT&T could not have known the material information that would place it on an equal, not even superior, footing with the Defendants, because the Defendants instructed Salience to withhold it -- there is no way the Defendants can continue to maintain that AT&T was of relatively equal knowledge or sophistication when it came to Salience's administration of the Metro Engagement or of its internal workings which directly bore upon same.[20] Given the unequal knowledge level of the parties AT&T's reliance upon the Pre-bills was reasonable. Regardless, the question of AT&T's reliance is a triable issue of fact. See Mass. Laborers' Health & Welfare Fund v. Philip Morris, 62 F. Supp.2d 236, 242 (D. Mass. 1999) (the reasonableness of a party's reliance constitutes a question of fact for the jury).

---

[20] See discussion supra at pp. 9-11.

Third, and as discussed supra at §II(A), it is of no consequence that the Pre-bills were estimates, promissory in nature. AT&T is still entitled to recover for the Defendants' fraud in connection with the Pre-bills. See discussion supra at §II(A).

Fourth, AT&T has properly brought this action to recover the damages proximately caused by the Defendants' fraudulent actions, which include inter alia misrepresenting Salience's ability to make the sales necessary to justify the Pre-bills with the knowledge that Salience did not have, among other things, enough headcount, morale, or the financial wherewithal to make such sales, and issuing same for payment. See e.g. CSOFs, ¶98; SOAFs, ¶¶115-135, 138-146, 160-161. Again, the contract between AT&T and Salience is implicated only insofar as it provided the Defendants and their agents the vehicle to carry out the Defendants' fraud. See id. Thus, AT&T's citation to Doody v. John Sexton & Co., 411 F.2d 1119 (1969) was proper at the time it filed its Opposition Papers and remains so today.

### III. Conclusion

Summary judgment may only be won by the Defendants if they can establish that there are no material facts in dispute and that they are entitled to judgment as a matter of law; the Defendants have failed to satisfy either prong. No rational review of the factual record or the state of the applicable law would allow for a defense victory at trial, let alone one at summary judgment. Thus, for the reasons discussed above, and those previously offered in AT&T's Opposition Papers, the Motion must be denied and the case allowed to proceed to trial on its merits.

Respectfully submitted,

AT&T CORP.,
By its attorneys,

/s/ Thomas T. Reith
Lawrence G. Green, BBO #209060
Thomas T. Reith, BBO #648671
PERKINS SMITH & COHEN LLP
One Beacon Street, 30th Floor
Boston, Massachusetts 02108
Telephone: (617) 854-4000

Dated: June 9, 2005

### CERTIFICATE OF SERVICE

I, Thomas T. Reith, hereby certify that on this 9th day of June 2005, a true and accurate copy of the above document was served upon the attorney of record for each other party electronically, as evidenced by the Notice of Electronic filing of the same date.

/s/ Thomas T. Reith